# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | CASE NO. 05-1773 |
| HILLING LUMBER CO., ) | |
| A & K LOGGING, INC., and ) | |
| KEH TRUCKING, INC. ) | Administratively Consolidated |
| ) | |
| Debtors. ) | |

## MEMORANDUM OPINION

Wells Fargo Financial Leasing, Inc. ("Wells Fargo"), seeks to compel disbursement of about $209,900 in auction proceeds related to the sale of a leased commercial building and three items of equipment. Branch Banking & Trust Company ("BB&T") opposes the motion asserting that the amount due to Wells Fargo is far less than $209,900 on two grounds: (1) the commercial building became part of the Debtor's real property, which limits Wells Fargo's recovery of proceeds to the amount that it inserted in the deed of trust securing the lease payments; and (2) the proceeds claimed by Wells Fargo on the individual items of equipment should be reduced pursuant to the parties's sale allocation agreement. BB&T also asserts that Wells Fargo owes it about $34,000 pursuant to an alleged private agreement for contribution based on the costs BB&T incurred in preserving the Debtor's assets for sale.

The court held a telephonic hearing in this matter on June 21, 2006, in Wheeling, West Virginia, at which time the court took the matter under advisement and ordered the parties to submit supplemental briefing. That briefing is now complete and the case is ripe for review. For the reasons stated herein, the court will: (1) declare that the commercial building is the personal property of Wells Fargo and that the sale proceeds from that building belong exclusively to Wells Fargo; (2) reduce the amount of proceeds claimed by Wells Fargo related to the sale of the three items of equipment; and (3) deny BB&T's motion for

1

contribution due to lack of sufficient evidence showing that any agreement for contribution existed.

## I. BACKGROUND

Hilling Lumber Company, A & K Logging, Inc., and KEH Trucking, Inc. (collectively the "Debtor") operated a logging operation from Monongalia County, West Virginia. In the ordinary course of that business, the Debtor executed various leases with Wells Fargo, and various security agreements with BB&T.

On April 8, 1999, Wells Fargo leased a 40x80x16' commercial building to Robert Reckart and Robert Reckhart, Jr., which was subsequently assigned to the Debtor on January 17, 2002. Wells Fargo does not own the 5.09 acres tract on which the building sits, and the lease gives the Debtor three options at its termination: (1) renew the lease for the fair rental value of the building; (2) purchase the building at fair market value; or (3) vacate and return the building. Should the Debtor elect to return the building, Wells Fargo had the Debtor's contractual permission to detach it from power, gas, telephone, sewer, or storm drain lines, and to break the building away from its foundations. As security for the monthly lease payment of $982 for a term of 84 months, Wells Fargo took a deed of trust on about seven acres of land in Clinton District, Monongalia County, West Virginia, which contains the 5.09 acre tract on which the building sits. The deed of trust, recorded on April 14, 1999, sets forth the payment terms of the April 8, 1999 lease, and states that it is to secure the payment of that lease. The deed of trust further states that the principal balance secured is $60,000.

Subsequently, the Debtor executed numerous notes with BB&T, the largest of which was executed on April 17, 2000, in the amount of $1,400,000. BB&T secured the Debtor's obligations under the notes with a deed of trust on the Debtor's real property – including the same seven acres subject to Wells Fargo's deed of trust – and by filing an August 18, 2000 UCC-1 statement that lists the Debtor's equipment as being subject to BB&T's security interest.

On January 22, 2002, Wells Fargo and the Debtor executed an equipment lease for, inter alia, 20 Reckart Lumber Carts (the "Carts").

On January 9, 2003, Wells Fargo and the Debtor executed a lease/purchase agreement for, inter alia, two items of equipment: a Precision 58/60 x 8 Knife Horizontal Chipper (the "Chipper"); and a 50' x 18" PayType Conveyor (the "Conveyor"). On January 27, 2003, Wells Fargo filed a financing statement

2

covering the Chipper and the Conveyor. All of Wells Fargo's leases and/or lease purchase agreements with the Debtor contain cross default clauses whereby a default under one lease was considered a default under all the leases.

The Debtor defaulted in its leases with Wells Fargo; consequently, Wells Fargo commenced an action for money damages in the Monongalia Circuit Court, and it also noticed a foreclosure sale of the Debtor's real property that was subject to its deed of trust. Before these actions were completed, the Debtor filed its Chapter 11 bankruptcy petition on April 21, 2005. On June 20, 2005, the court approved an agreed order between Wells Fargo and the Debtor whereby the Debtor was required to make adequate assurance payments to Wells Fargo, and if the Debtor defaulted, the leases were deemed rejected. Thereafter, the Debtor defaulted on the terms of the agreed order, and the case converted to one under Chapter 7 on November 10, 2005. Wells Fargo agreed to allow the Chapter 7 trustee to sell the commercial building and the other items that it leased to the Debtor.

The trustee conducted an auction on March 4, 2006, at which the Debtor's real and personal property were auctioned, first pursuant to individualized bids, and then in bulk. The total of the individualized bids was $750,000, but no individual bid was submitted for the Debtor's real property, which required a minimum bid of $500,000. The bulk bid, which included the real estate, was for $800,000, and was accepted by the auctioneer and the trustee. The liens of Wells Fargo and BB&T attached to the proceeds of that sale. Wells Fargo and BB&T have amicably divided the proceeds of the sale with the exception of the commercial building, the Chipper, the Conveyor, and the Carts.

## II. DISCUSSION

BB&T asserts that Wells Fargo is not entitled to the full proceeds representing the value of the commercial building on the basis that the commercial building became part of the Debtor's real property; thus, Wells Fargo is limited to receiving its secured claim as stated in the deed of trust, which cannot be more than $60,000.[1] BB&T does not dispute that Wells Fargo has a first priority interest in the items of

---

[1] BB&T contends that the total amount of debt owed to Wells Fargo under the deed of trust is $39,442, which was the default amount due under the lease of the commercial building as stated by an April 25, 2005 court document filed by Wells Fargo.

3

equipment it leased to the Debtor; however, it disputes the price allocation formula used by Wells Fargo for individual equipment when all the assets of the Debtor were sold pursuant to a bulk bid – not individualized bids.  Finally, BB&T asserts that Wells Fargo owes it about $34,000 pursuant to a private agreement, representing its half of the expenses that BB&T incurred in preserving the Debtor's property for auction.

### A.     The Real Property / Commercial Building

Wells Fargo argues that it leased the 40x80x16' commercial building to the Debtor,  only the leasehold interest in that building became property of the estate, its lease was rejected, and that any sale proceeds attributable to the commercial building reflect a sale of its sole property.

BB&T argues that the commercial building became part of the Debtor's real property when it was constructed on the basis that the building has a steel beam frame, steel siding, a roof, and is attached to a concrete pad.  BB&T further argues that once the building became part of the real property, any liens on it are governed by real property law.

"In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."  *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992).   Under West Virginia law, "[t]he true criterion of a fixture is the united application of the following requisites: (1) annexation to the realty or something appurtenant thereto; (2) application to the use or purpose to which that part of the realty with which it is connected is appropriated; (3) the intention of the party making the annexation to make a permanent accession to the freehold." 1 M.J. of Virginia & West Virginia, *Fixtures* § 3 (2004) (citing, inter alia, *West Virginia Dep't of Hwys. v. Thompson*, 375 S.E.2d 585, 588 (W. Va. 1988)).  The most important factor is the intent of the parties.  *E.g.*, *Blair v. Freeburn Coal Corp.*, 253 S.E.2d 547, 552 (W. Va. 1979) ("Basically, whether a fixture becomes part of the real estate to which it is affixed is determined by the intention of the parties.").

The following facts convince the court that the parties never intended the commercial building to become part of the Debtor's real property; consequently, the commercial building never lost its classification as personal property.  First, the commercial building that Wells Fargo leased to the Debtor was never incorporated into an existing improvement on the Debtor's real property; rather, the entire structure was placed there by Wells Fargo.  Second, the parties' agreement specifically states that the

4

building "is personal property and that title shall remain in the Lessor's name exclusively even though affixed to the real property." Third, at the end of the lease term, the Debtor had three options: enter a new lease of the building for its fair rental value, purchase the building for its fair market value, or allow Wells Fargo to remove it from the premises, by, inter alia, disconnecting it from utility lines and removing it from its concrete slab foundation. The fact that the Debtor could purchase the building was only one of three options. Noticeably absent from the lease agreement is any indication that the Debtor would become the owner of the building at the end of the lease term by paying a nominal amount of consideration. Fourth, it appears that Wells Fargo did not extend credit to the Debtor based on any enhancement to the value of the Debtor's realty; it recorded a deed of trust on the Debtor's realty only for the purpose of securing payments under the lease. Indeed, as indicated by Wells Fargo, the value of the underlying real property (roughly seven acres with a value of about $2,500 per acre, or $17,500) is far less than the total amount due under the lease (84 monthly payments of $982, or $82,488).

The court's holding in this case is in accord with those courts applying a different State's law based on similar circumstances. *E.g.*, *Wiggins Ferry Co. v. Ohio & M. R. Co.*, 142 U.S. 396, 416 (1892) ("[I]t is difficult to conceive that any fixture, however solid, permanent and closely attached to the realty, placed there for the mere purposes of trade, may not be removed at the end of [lease] term.")*; In re Chicago, R. I. & P. R. Co.*, 753 F.2d 56, 58-59 (7th Cir. 1985) (holding that a grain elevator, permanently affixed to the real property, belonged to the tenant that constructed the grain elevator under Iowa law because the lease gave the tenant the right to remove all of its real and personal property at the end of the lease term – including buildings); *Van Dorn v. Bank & Trust Co. (In re Van Dorn)*, No. 04-7180, 2005 Bankr. LEXIS 219 at *2-4 (Bankr. C.D. Ill. Feb. 16, 2005) (holding that a metal pole barn, affixed to a concrete floor, with roofing and siding, was personal property subject to a lease and was not part of the real property when the parties agreement provided that it was personal property); *Jarvis v. Wells Fargo Fin. (In re Jarvis)*, 310 B.R. 330, 336 (Bankr. N.D. Ohio 2004) (holding that leased hog farm buildings, set on sturdy concrete foundations and hooked-up to utilities, did not become part of the realty under Ohio law because, inter alia, the lease agreement provided for three options on termination: a new lease, purchase for the fair market value, or removal).

Because BB&T has failed to show that the Debtor and Wells Fargo intended the building to

become part of the Debtor's real property, the building itself never became subject to Wells Fargo's deed of trust because the building was always owned by Wells Fargo.[2]  Accordingly, any proceeds from the sale of the commercial building belong to Wells Fargo as the owner of that building.

Any proceeds attributable to the sale of the real property, however, belong to the estate, and is subject to the competing deeds of trust between Wells Fargo and BB&T.  Because Wells Fargo's deed of trust was recorded before BB&T's, Wells Fargo has the first priority in the proceeds of the sale to the extent that it has a secured claim for unpaid rental payments.  Regarding the value of the property subject to its deed of trust, Wells Fargo states:

> [T]he assessed value of the larger parcel which contains the [commercial building] Premises is $292,200.  The twelve (12) acre parcel includes roughly 5 acres which the Deed of Trust does not encumber.  Upon information and belief, the real estate is worth approximately $2,500 per acre.

(Document No. 273, ¶ 42).

Thus, assuming that the valuation of the land as stated by Wells Fargo is accurate, the value of the real property subject to Wells Fargo's deed of trust is only $17,500.[3]  As of April 25, 2005, Wells Fargo represented that the accelerated balance owed under the April 8, 1999 lease was $39,442, which amount is not disputed by BB&T.  Because the debt secured by the deed of trust is far in excess of the value of the land, Wells Fargo is entitled to the entire value realized from the sale of the real property subject to its deed of trust.[4]

---

[2] In its response to Wells Fargo's motion for disbursement of sale proceeds, BB&T states: "Wells Fargo has argued that [the commercial building lease] is a 'true lease.'  The concept of a 'true lease', as opposed to a "financing lease', is a personal property financing concept under the Uniform Commercial Code and has no applicability to real property law."  (Document No. 285, ¶ 47).  Thus, BB&T did not contest whether or not the April 8, 1999 lease was a "true lease."

[3] The actual value of the real property is subject to apportionment based on the portion of the bulk sale proceeds allocated to the Debtor's real property.

[4] BB&T asserts that a dispute exists over whether Wells Fargo was paid all amounts due under the lease of the commercial building.  That dispute is not presently before the court, and the court will assume for purpose of this opinion that Wells Fargo's claim arising out of the Debtor's default of the April 8, 1999 lease is at least $39,442.

**B.     The Conveyor, Chipper & Carts**

Wells Fargo contends that it is entitled to the following amount of sale proceeds: $10,000 for the Conveyor, $34,000 for the Chipper, and $15,900 for the Carts. These sums are based on individual bids for the items at the auction. Wells Fargo and BB&T both state that the parties agreed to allocate the proceeds to the individual items of equipment pursuant to the individual bids if the bulk bid was successful. In this case the individual bids totaled $750,000 and the bulk bid was for $800,000. Therefore, Wells Fargo contends it is entitled to the above-stated sale proceeds, which represents the full value of the individualized bids for those items.

BB&T does not contest that Wells Fargo is entitled to a priority portion of the proceeds representing the sale of the Chipper, Conveyor and Carts. BB&T, however, disagrees with how Wells Fargo has allocated the proceeds to those items.

According to BB&T, when the Debtor's real property and equipment were auctioned individually, no party submitted a qualified bid for the Debtor's real property; thus, the full $750,000 represented the bids solely submitted for individualized items of equipment. On March 2, 2006, before the auction, the parties held a meeting – which Wells Fargo failed to attend – whereby the minimum bid for the real property was set at $500,000. BB&T alleges that this number was agreed-on so that the sale of the real property would be valid under West Virginia law and not be subject to a subsequent attack based on inadequate consideration. The bulk bid of $800,000, of course, was only $50,000 more than the individualized bids submitted solely for the equipment. The auctioneer's report reflects that the purchaser paid $300,000 for Debtor's equipment. Therefore, according to BB&T's interpretation of the agreement, the individual prices received for the equipment alone must be reduced in proportion to the allocation between the real and personal property in the bulk sale. Consequently, BB&T asserts that the amount of sale proceeds Wells Fargo is entitled to from the sale of the Chipper is not $34,000, but is $13,600

---

Wells Fargo also states that the amount of its secured claim in the Debtor's real property includes the purchase price value of the building on the basis that – should the Debtor exercise the purchase option – that debt would be covered by the deed of trust. Wells Fargo, however, has not demonstrated that the Debtor ever exercised the lease's purchase option; therefore, no such debt exists for the deed of trust to secure.

7

($300,000 / $750,000 x $34,000).

Wells Fargo argues that it did not attend the March 2, 2006 meeting, it never agreed to an allocation of $500,000 for the sale of the real property, and that it is not bound by any agreement made at the meeting. Whether or not Wells Fargo attended that meeting or agreed to the minimum allocation to the real property is irrelevant – the auctioneer's report allocates $300,000 of the $800,000 purchase price to the Debtor's equipment and Wells Fargo has not sought to set-aside the results of the auction.

Both parties relate that they had an agreement to allocate the proceeds of the bulk sale based on the individualized bids for the Chipper, Conveyor, and Carts. The parties did not expressly agree, however, on what would happen if the allocation given to the Debtor's equipment in the bulk bid was substantially lower than the aggregate amount of the individualized bids. "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *Restatement (Second) Contracts* § 204 (1981). In supplying a term, the court should supply one that is reasonable in light of the purpose of the contract, considering what term the parties would have agreed to if the questions had been brought to their attention, and impose a term that "comports with community standards of fairness and policy . . . ." *Id.* cmt. (d); *see, e.g.*, *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 236 (4th Cir. 2006) ("In certain instances, when the contracting parties have failed to specify a term that is essential to the determination of their rights and duties under an arbitration agreement, the [court] may supply a term that is 'reasonable in the circumstances.' "), *cert. denied*, 2006 U.S. LEXIS 7811 (Oct. 16, 2006); *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 655 (7th Cir. 2004) ("If contracting parties had to provide for every contingency that might arise, contract negotiations would be interminable. Contracts can be shorter and simpler and cheaper when courts stand ready to fill gaps and resolve ambiguities in the minority of contracts that get drawn into litigation.").

The court believes that the argument presented by BB&T best represents what the parties would have agreed to in advance of the auction had they considered the matter, and that it best comports with community standards of fairness and policy, for the following reasons: (1) the fact that the bulk bid would be different from the aggregate of the individual bids was nearly certain; (2) the parties did not know in advance what the ultimate allocation would be between the real and personal property; (3) the parties

8

plainly contemplated that the proceeds to which Wells Fargo would be entitled from the bulk bid would be tied to the amount of the individualized bid for the specific item; (4) had the price allocation for the bulk equipment sale been higher than the aggregate of the individual bids, then Wells Fargo would have been entitled to a greater amount of the bulk sales proceeds than it would have received for the individual bids; (5) without reference to the individual bids, it would be difficult to make an allocation for individual items of equipment from the bulk sale proceeds; and (6) only a finite amount of bulk sales proceeds are available – to give effect to Wells Fargo's argument would mean that the value of the real property is only $50,000, which is expressly contrary to the auction report.

Therefore, the court concludes that Wells Fargo is entitled to $13,600 in proceeds from the sale of the Chipper; $4,000 from the sale of the Conveyor, and $6,360 from the sale of the Lumber Carts.

**C.  Agreement to Split Expenses**

BB&T states that it and Wells Fargo agreed to split expenses for the costs incurred in protecting the Debtor's West Virginia property that was auctioned on March 4, 2006. BB&T further asserts that Wells Fargo has refused to perform under that agreement and that its one-half share of the expenses total $34,039.87.

Wells Fargo responds that it never agreed with BB&T to split the expenses associated with the auction sale. In a February 22, 2006 email from Todd Hannah at BB&T to David DiVencenzo, the regional collection manager at Wells Fargo, BB&T sent a breakdown of BB&T expenses and requested payment. David DeVencenzo's affidavit, however, states that Wells Fargo never agreed to share any of BB&T's expenses.

The burden of proving that a contract exists rests on the proponent of that contract. *E.g.*, *McCully v. McLean*, 37 S.E. 559, 560 (W.Va. 1900) ("The burden of proving this contract rested upon the plaintiff and it should have been established by a preponderance of the testimony."). The email message that BB&T sent to Wells Fargo on February 22, 2006, without more, is insufficient to carry BB&T's burden of proof that an agreement existed between the parties to split the expenses of preserving the Debtor's assets for auction because it fails to show that Wells Fargo ever assented to such an arrangement. Therefore, the court will deny BB&T's request for contribution from Wells Fargo.

9

## III. CONCLUSION

Therefore, Wells Fargo will be declared the owner of the 40x80x16 commercial building, will be entitled to the proceeds of the sale of the seven acres of land that is subject to its deed of trust, and will be entitled to the proceeds from the sale of the Chipper, Conveyor, and the Carts in the amounts set forth above. The court will deny BB&T's request for contribution, and the court will direct the auctioneer to disburse auction proceeds consistent with this Memorandum Opinion. The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021.